UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| RICHARD STAUBITZ, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ARTHREX, INC.,<br><br>Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Richard Staubitz ("Plaintiff"), on behalf of himself and all others similarly situated, by his attorneys, alleges the following upon information and belief, except for those allegations pertaining to Plaintiff, which are based on his personal knowledge:

**NATURE OF THE ACTION**

1. This action seeks to remedy personal injuries caused by Knotless 1.8 Fibertak Soft Anchors ("Anchor(s)"), defective medical devices manufactured by Defendant Arthrex, Inc. ("Arthrex").

2. In April 2023, Plaintiff underwent arthroscopic surgery to repair a labral tear in his left shoulder. During the repair, the surgeon reattached Plaintiff's labrum by suturing the torn portion to Athrex Anchors inserted into Plaintiff's glenoid (the shoulder socket).

3. Following surgery, Plaintiff experienced a lack of mobility and substantial pain beyond what would reasonably be expected during a normal recovery. In May and June 2023, Plaintiff discovered that metal fragments of the Anchors and/or Anchor inserters had broken off inside his shoulder during surgery causing him injury and impeding his recovery.

4. As demonstrated by dozens of adverse reports to the United States Food and Drug Administration ("FDA") describing substantially similar anchor breaks, a design or manufacturing

1

defect in Arthrex's Anchors and/or Anchor inserters frequently causes the Anchor inserter tip to break when used as intended and directed by Arthrex.

5. Arthrex received between 28 and 38 reports of Anchor breakage between the time the Anchors entered the market (late 2022) and Plaintiff's shoulder surgery (April 3, 2023) and approximately 50 reports of Anchor breakage in total. Despite Arthrex's actual or constructive knowledge of the breakage risk prior to Plaintiff's surgery, Arthrex did not warn or disclose the breakage risk to Plaintiff or to medical providers including Plaintiff's orthopedic surgeon. The Anchors used in Plaintiff's April 2023 surgery suffered from the Anchor breakage defect, causing metal fragments of the Anchor or Anchor inserters to break off and to inflict substantial injury and pain on Plaintiff.

6. On July 10, 2023, Plaintiff underwent a second arthroscopic shoulder surgery to remove the metal fragments and to revise his prior labrum repair. Plaintiff's second surgery—entirely unnecessary but for the Anchor breakage defect—resulted in additional substantial recovery time and substantial injury and pain to Plaintiff's left shoulder.

**7.** Based on the foregoing, Plaintiff asserts claims on behalf of himself and the Class (defined below) against Arthrex for: (1) Strict Products Liability—Design Defect; (2) Strict Products Liability—Manufacturing Defect; (3) Strict Products Liability—Failure to Warn; (4) negligence; and (5) breach of implied warranty.

## PARTIES

8. Plaintiff is, and was at all relevant times, a resident and citizen of New York, residing in Kings County.

9. Arthrex is a Delaware corporation with its principal place of business at 1370 Creekside Boulevard, Naples, Florida 34108.

## JURISDICTION AND VENUE

10. This Court has original jurisdiction over this case under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). Minimal diversity exists between members of the proposed Class and Arthrex. Arthrex is a citizen of Florida and Delaware, and Plaintiff is citizen of New York. The amount in controversy in this action exceeds $5,000,000, exclusive of interest and costs, and there are more than 100 members in the proposed Class.

11. This Court also has original jurisdiction over this case under 28 U.S.C. 1332(a). Complete diversity exists between Plaintiff and Arthrex: Plaintiff is a citizen of New York and Arthrex is a citizen of Florida and Delaware. Moreover, the amount in controversy exceeds $75,000, exclusive of interest and costs.

12. This Court has personal jurisdiction under NY CPLR § 302. Arthrex transacts business in New York and Plaintiff's claims arise from those business transactions. Furthermore, exercising personal jurisdiction over Arthrex satisfies due process requirements based on Arthrex's business in, and substantial contacts with, New York.

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391. Plaintiff resides in this District, and a substantial portion of the events or omissions giving rise to Plaintiff's claims occurred in this District, including Plaintiff's injuries.

## FACTUAL BACKGROUND

**A.     The Anchors' Role in Labral Repair Surgery**

14. Arthrex manufactures, markets, distributes, and sells the Anchors.

15. Upon information and belief, Arthrex began marketing, distributing, and selling the Anchors in late 2022.

16. The Anchors are composed of: (1) a soft Anchor which consists of a polyester sheath; (2) an Anchor inserter, which is made of titanium, PEEK (polyetheretherketone), poly (L-

3

Lactide) or poly (L-Lactide-co-D, L-Lactide); and (3) a suture, which runs through the anchor and is made primarily with UHMWPE (ultra-high molecular weight polyethylene) and polyester over a core of UHMWPE yarns:




17.     Arthrex states that the "Knotless 1.8 Fibertak soft anchor is the latest in knotless tensionable technology for instability. This design combines trusted knotless technology with the latest in suture innovation. The updates help improve implant insertion, help improve handling characteristics, and provide premium instrumentation with additional stability."

18.     Arthrex states that the use of the Anchors is indicated for shoulder, foot/ankle, knee, hand/wrist, elbow, and hip surgeries, including for labral tear repairs in the shoulder. The labrum is a fibrocartilaginous complex that attaches as a rim to the articular cartilage of the glenoid. Tears can occur at several different locations along the shoulder labrum:



19. Generally, during an arthroscopic labral repair using the Arthrex Anchors, the surgeon—using an implant handle and guide—drills a hole in the glenoid to create a bone socket for the Anchor; places the Anchor into the bone socket using the inserter; extracts the inserter; and sutures the damaged portion of the labrum onto the glenoid using the Anchor as a base:



5

**B.     Plaintiff Underwent Labral Repair Surgery and the Defective Arthrex Anchors Broke, Leaving Metal Fragments and Causing    Substantial Injury and Pain to Plaintiff**

20.     In August 2022, Plaintiff experienced a sharp pain in his left shoulder while exercising. From that time, Plaintiff experienced pain in his left shoulder and a lack of mobility and range of motion.

21.     In January 2023, an MRI revealed a left shoulder labral tear.  Plaintiff subsequently consulted with Elizabeth R. Dennis, MD, an orthopedist. Dr. Dennis recommended surgery to repair the torn labrum.

22.     On April 3, 2023, Plaintiff underwent arthroscopic surgery performed by Dr. Dennis on his left shoulder to repair his torn labrum. Dr. Dennis used Arthrex Anchors as intended and directed by Arthrex to attempt to repair Plaintiff's torn labrum.

23.     Following surgery, Plaintiff did physical therapy, but Plaintiff's recovery was greatly impacted by a significant lack of mobility and range of motion as well as by constant and significant pain.

24.     In May and June 2023, an X-Ray and CT scan revealed that Plaintiff's lack of mobility and pain resulted from two metal fragments in Plaintiff's shoulder after the Anchor inserters broke. One broken metal fragment remained in the glenoid and one broken metal component protruded out of the glenoid and into the shoulder joint space.

25.     In June 2023, Plaintiff consulted with Dr. Dennis regarding the metal fragments in his shoulder as well as his ongoing pain and discomfort. Dr. Dennis recommended a second surgery to remove one or both metal fragments as well as a possible revision of Plaintiff's labral repair.

26. In early July 2023, Plaintiff received a second opinion from Dr. Nicholas Montemurro, MD (another orthopedist) regarding the metal fragments in his shoulder as well as his ongoing pain and discomfort. Dr. Montemurro agreed that surgery to remove the broken metal fragments wasrequired, and Plaintiff subsequently underwent a second surgery.

27. On July 10, 2023, Plaintiff underwent a second arthroscopic shoulder surgery performed by Dr. Dennis. Dr. Dennis removed the metal fragments from Plaintiff's shoulder and performed a revision of Plaintiff's torn labrum repair, this time using PEEK PushLock Anchors, Short, 2.9mm x 12.5mm, a different suture anchor manufactured by Arthrex.

28. The initial Anchor breakage and Plaintiff's second shoulder surgery—which was only necessary due to the Anchor breakage defect—resulted in current and future medical expenses and injury to Plaintiff, including an unduly prolonged recovery and physical therapy; emotional distress; ongoing limited mobility and range of motion; and substantial, ongoing pain and suffering.

29. Upon information and belief, after Arthrex became aware of the specific Anchor break during Plaintiff's April 2023 surgery, as well as other Anchor breakages, Arthrex requested that the hospital where Plaintiff had his surgery and its medical providers stop using the Anchors and return all Anchors to Arthrex for further investigation.

**B. The Anchors Used in Plaintiff's Initial Surgery Suffered from a Defect Creating a Known But Undisclosed Risk of Anchor Breakage**

30. The Anchors used in Plaintiff's initial labral repair suffered from a design or manufacturing defect, and Arthrex failed to warn or disclose the Anchor breakage risk despite actual or constructive knowledge of the risk.

7

31. Arthrex, as manufacturer of the Anchors, fully understood the Anchor's design and manufacturing process, as well as the latent risks associated with the Products, including the risk of Anchor breakage.

32. Plaintiff and his medical providers did not and could not know of the Anchor breakage risk because it was not disclosed by Arthrex prior to Plaintiff's surgery. Moreover, Plaintiff and his medical providers did not and could not discover the Anchor breakage defect through reasonable inspection or other means prior to or during Plaintiff's surgery.

33. Arthrex had a duty to design the Anchor to prevent the foreseeable risk of Anchor breakage. Despite that duty, Arthrex's Anchors posed a substantial likelihood of harm due to the unreasonable risk that the Anchor and/or Anchor inserter could break even when used as intended and directed by Arthrex.

34. The Anchor breakage risk posed by Arthrex's defective design could have been prevented though feasible designs that would preserve the tensile strength of the Anchor including:

- Designing the inserter using different, more durable materials in the anchor inserter or by using a different, more durable composite of titanium, PEEK (polyetheretherketone), poly (L-Lactide) or poly (L-Lactide-co-D, L-Lactide);

- Designing the inserter to distribute impact forces evenly and to reduce stress concentrations during the insertion process (which involves hammering the anchor into the bone anchor using a mallet); and/or

- Designing the Anchor or Anchor inserter to facilitate an extraction process that would reduce tension and reduce the risk of Anchor or Anchor inserter breakage.

35. Arthrex also had a duty to manufacture the Anchors to prevent the foreseeable risk of Anchor breakage, including by ensuring that manufacturing processes are well-controlled and optimized to produce consistent and reliable Anchors and by implementing rigorous quality control, prototyping, testing, and audit measures to prevent the Anchor breakage risk.

36. Despite that duty, the Anchors suffered from a manufacturing defect because of a mishap in the manufacturing process; improper workmanship; or because defective materials were used in construction.

37. The Anchors deviated in quality and other performance standards from other identical Anchors, including through:

- The use of defective materials;

- A deviation in materials used or an unintended deviation from Arthrex's specified composite of titanium, PEEK (polyetheretherketone), poly (L-Lactide) or poly (L-Lactide-co-D, L-Lactide);

- A deviation in workmanship or construction from other identical Anchors that increased the risk that impact forces would cause a breakage; and/or

- A deviation in quality assurance, testing, or audit measures by Arthrex.

38. Alternatively, the Anchors suffered a design or manufacturing defect at the time of sale or distribution because the Anchors did not perform as intended and there can be no other cause of the Anchor breakage other than a product defect. Arthrex Anchors should not break when used as directed and intended by Arthrex unless there was a product defect existing at the time of sale or distribution, and the Anchor breakage was not caused by any other factor, as Dr. Dennis performed Plaintiff's arthroscopic labral repair with due care and used the Anchors as intended and instructed by Arthrex. Moreover, two of the Anchors broke.

39. Discovery will ultimately reveal the precise nature of the Anchors' design or manufacturing defect, but Arthrex cannot avoid liability because it alone possesses knowledge and evidence of the source of defect which caused the Anchor breakage.

40. Arthrex knew or should have known of the Anchor breakage risk prior to Plaintiff's surgery, but it did not disclose that risk to Plaintiff or his medical providers.

41. Arthrex, as a sophisticated manufacturer of medical devices, has access to cutting-edge research and technology. Moreover, Arthrex is subject to regulatory oversight and internal quality assurance and prototyping and testing programs that—when properly implemented—should identify existing and emerging risks to its medical devices and end-users.

42. Moreover, as reflected by the FDA's Manufacturer and User Facility Device Experience (MAUDE) system, Arthrex received an unusual number of adverse reports of Anchor breakage between the time Arthrex began to market, distribute, and sell the Anchors and prior to and shortly after Plaintiff's surgery (late 2022 to June 2023). During that time, Arthrex received approximately 50 (fifty) reports of Anchor breakage identical to the Anchor breakage that occurred during or after Plaintiff's labral repair surgery. By sharp contrast, during that same time, Arthrex received one adverse report concerning the PEEK PushLock Anchor, Short, 2.9mm x 12.5mm (the anchor used in Plaintiff's revision surgery).

43. Of the fifty Anchor break reports Arthrex received between late 2022 and June 2023, between 28 and 38 reports were received by Arthrex prior to Plaintiff's April 2023 labral repair surgery and they bear striking similarities to Plaintiff's case, including:

- Reports of Anchor inserters breaking upon Anchor insertion and/extraction;

- Reports about Anchor inserter metal fragments coming loose and lodging in the joints or joint spaces;

- Reports that Anchor inserter metal fragments were only discovered post-surgery during X-rays and CT scans;

- Reports of loss of mobility and pain; and

- Reports of revision surgeries to remove the fragments and correct damage from broken Anchors.

44. Upon information and belief, despite receiving these reports, Arthrex did not disclose the Anchor breakage risk to or warn Plaintiff or his medical providers in any way prior to Plaintiff's initial labral repair surgery, including in the Anchor's directions for use; the Anchor website; Anchor instructional videos; or through other means.

## CLASS ALLEGATIONS

45. Plaintiff seeks to represent and certify the following Class:

    All United States residents who suffered physical injuries after an Arthrex Anchor or inserter broke during the applicable statute of limitations.

46. The foregoing Class excludes any judge or magistrate assigned to this case, Arthrex, Arthrex's officers, directors, legal representatives, successors, and assigns, and any entity in which Arthrex has a controlling interest.

47. Plaintiff satisfies the requirements of Rule 23(a) and Rule 23(b).

48. <u>Numerosity</u>: This proposed class action involves at least approximately fifty individuals according to MAUDE adverse event reports filed with the FDA. Although the exact numbers are unknown to Plaintiff, the number of individuals in the Class exceeds forty (40). As a result, the Class is so numerous that joinder of all members is impracticable.

49. The proposed Class is defined by objective criteria so that it is administratively feasible for the Court to determine whether a particular individual is a member. Individual class members can be identified through affidavits and/or reference to documents in Arthrex's possession, custody, or control without resort to a mini-hearing on the merits.

50. <u>Commonality</u>: The questions of law and fact common to Class predominate over any questions which may affect individual members of the Class and include:

    a. How the Anchors became defective;

    b. When and how Arthrex knew or suspected that the Anchors were defective;

11

    c.     Whether the Anchors designed, manufactured, and labeled by Arthrex were safe for their intended use;

    d.     Whether the foreseeable risks of the Anchors exceeded the benefits associated with the Anchors given the substantial breakage risk;

    e.     Whether the foreseeable risks posed by the Anchors could have been avoided or reduced through a reasonable alternative design;

    f.     Whether the Anchors deviated from design specifications or formulations;

    g.     Whether Arthrex knew or should have known about Anchor breakage risk;

    h.     Whether Arthrex adequately warned consumers or health care providers of the foreseeable danger that the Anchors would break;

    i.     Whether Arthrex was negligent;

    j.     Whether Arthrex breached the implied warranty of merchantability/fitness for a particular purpose; and

    k.     Whether Plaintiff and the Class are entitled to actual, compensatory, and punitive damages.

51. <u>Typicality</u>: Plaintiff's claims are typical of those belonging to members of the Class. Like the Class, Plaintiff suffered a personal injury after an Anchor or inserter broke.

52. <u>Adequacy</u>: Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has retained counsel experienced in complex class action litigation, and Plaintiff and his chosen counsel have no interests adverse to those of the Class.

<u>Rule 23(b)(3)</u>

53. Common questions of law and fact exist as to every member of the Classss and predominate over any questions solely affecting individual members of the Class, including the common questions identified above.

54. A class action is also superior to other available means for the fair and efficient adjudication of this controversy for other reasons. Individualized litigation presents a potential for

inconsistent or contradictory judgments. In contrast, a class action presents far fewer management difficulties; allows the hearing of claims that might otherwise go unaddressed; and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Individual class member's interests in individually controlling the prosecution of separate actions are outweighed by their interest in efficient resolution by a single class action, and it would be desirable to concentrate in this single venue the litigation of all class members who were induced to purchase and use the defective Products and were injured by Defendant's uniform misconduct.

Rule 23(c)(4)

55. Alternatively, to the extent that class certification under Rule 23(a) and (b) cannot be obtained (which cannot be determined at this stage of the case), the issues of fact or law (among many other issues of fact or law) identified above are common to all members of the Class and can be resolved on behalf of the Class through Rule 23(c)(4).

56. Plaintiff cannot be certain of the form and manner of proposed notice to members of the Class until the Class is finally defined and discovery is completed regarding the identity of class members. Plaintiff anticipates, however, that notice by mail will be given to members of the Class who can be identified specifically. In addition, notice may be published in appropriate publications, on the internet, in press releases and in similar communications to reach members of the Class.

57. Plaintiff reserves the right to modify or amend the definition of the proposed Class and to assert additional subclasses at any time before the Class is certified by the Court.

**FIRST CLAIM FOR RELIEF**
**STRICT PRODUCTS LIABILITY: DESIGN DEFECT**

58. Plaintiff realleges and incorporates by reference the allegations elsewhere in the

Complaint as if set forth fully herein.

59. Arthrex is the manufacturer, distributor, and/or seller of the Anchors.

60. Plaintiff brings this claim on behalf of himself and the Class.

61. A manufacturer, distributor, or seller may be held strictly liable for a design defect when, at the time the product leaves the manufacturer's/distributor's/seller's hands, the product is in a condition not reasonably contemplated by the ultimate consumer and is unreasonably dangerous for its intended use; that is one whose utility does not outweigh the danger inherent in its introduction into the stream of commerce.

62. Here, the Anchor as designed posed a substantial likelihood of harm due to an unreasonable risk of Anchor breakage even when the Anchor was used as intended and directed by Arthrex.

63. It was feasible to design the Anchors in a safer manner, including—as described above—by using alternative materials, using an alternative composite of materials, or by designing the Anchor or Anchor inserter to increase durability.

64. The Anchor's defective design caused the Anchor or inserter to break in Plaintiff's shoulder causing Plaintiff injury in an amount to be determined at trial. Further, Arthrex's actions and omissions as identified in this Complaint constitute a flagrant disregard for human life.

## SECOND CLAIM FOR RELIEF
## STRICT PRODUCTS LIABILITY: MANUFACTURING DEFECT

65. Plaintiff realleges and incorporates by reference the allegations elsewhere in the Complaint as if set forth fully herein.

66. Plaintiff brings this claim on behalf of himself and the Class.

67. Arthrex is the manufacturer, distributor, and/or seller of the Products.

68. A manufacturer, distributor, or seller may be held strictly liable for a manufacturing

defect when, at the time the product leaves the manufacturer's/distributor's/seller's hands, a specific product unit was defective as a result of some mishap in the manufacturing process, improper workmanship, or because defective materials were used in its construction, thereby causing Plaintiff's injury.

69. Here, a manufacturing flaw existed in the Anchor because it deviated in quality and other performance standards from other identical Anchors through: (1) the use of defective materials; (2) an unintended deviation in materials used or an unintended deviation from Arthrex's specified composite of titanium, PEEK (polyetheretherketone), poly (L-Lactide) or poly (L-Lactide-co-D, L-Lactide); and/or (3) an unintended deviation in workmanship or construction from other identical Anchors that increased the risk that impact forces would cause a breakage.

70. At this early stage, Plaintiff cannot be sure of the precise design or manufacturing defect that led to the Anchor breakage because the design and manufacturing process is uniquely within the knowledge and control of the Arthrex as manufacturer, distributor, or seller. However, under no circumstances should the Anchor or inserter have broken, and it is certain that the Anchors suffered from a manufacturing and or design defect because the Anchors did, in fact, break and the Anchor breakage cannot be attributed to any other cause but a manufacturing or design defect.

71. The Anchor's manufacturing defect caused the Anchor and/or Anchor inserter to break in Plaintiff's shoulder causing Plaintiff injury in an amount to be determined at trial. Further, Arthrex's actions and omissions as identified in this Complaint constitute a flagrant disregard for human life.

**THIRD CLAIM FOR RELIEF
STRICT PRODUCTS LIABILITY:
FAILURE TO PROVIDE ADEQUATE WARNING**

72. Plaintiff realleges and incorporates by reference the allegations elsewhere in the Complaint as if set forth fully herein.

73. Plaintiff brings this claim on behalf of himself and the Class.

74. Arthrex is the manufacturer, distributor, and/or seller of the Products.

75. A manufacturer, distributor, or seller may be held strictly liable for a design defect when, at the time the product leaves the manufacturer's/distributor's/seller's hands, the manufacturer/distributor/seller failed to provide adequate warnings regarding the risks and dangers associated with the use, or foreseeable misuse, of its product.

76. Here, Arthrex failed to warn or disclose to Plaintiff or his medical providers the Anchor breakage risk despite a duty to do so.

77. Athrex knew or should have known of the Anchor breakage risk prior to Plaintiff's surgery based on (1) its prototyping and testing, quality assurance measures, and audit procedures; and (2) dozens of adverse reports of Anchor breakage from the time Arthrex began manufacturing, marketing, and selling the products and the time of Plaintiff's initial shoulder surgery.

78. The Anchors manufactured, distributed, and/or sold by Arthrex were defective due to inadequate warnings or instructions because Arthrex failed to adequately warn consumers and medical providers that the Anchor or Anchor inserter could break even when used as intended and directed by Athrex and/or that medical providers should be aware of and search for retained metal fragments or other anchor components prior to completing surgery.

79. Plaintiff's medical providers reviewed the Anchor's labeling and instructions and used the Anchors as directed without any knowledge of the breakage risk because Arthrex did not include any warnings or instructions regarding that risk. Plaintiff and his medical providers would not have purchased or used the Anchors had Arthrex included proper warnings and instructions on

16

the Anchor breakage risk or would have prevented or discovered the anchor breakage that occurred during Plaintiff's initial surgery.

80. Arthrex's failure to warn or properly instruct on the anchor breakage risk proximately caused Plaintiff's injury in an amount to be determined at trial. Plaintiff's medical providers would have heeded warnings regarding the Anchor breakage risk or used a different suture anchor had they been aware of the Anchor breakage risk. Further, Arthrex's actions and omissions as identified in this Complaint constitute a flagrant disregard for human life.

## FOURTH CLAIM FOR RELIEF
## NEGLIGENCE

81. Plaintiff realleges and incorporates by reference the allegations elsewhere in the Complaint as if set forth fully herein.

82. Plaintiff brings this claim on behalf of himself and the Class.

83. Arthrex is the manufacturer, distributor, and/or seller of the Products.

84. Arthrex had a duty to exercise reasonable care in designing, manufacturing, testing, marketing, and distributing the Anchors into the stream of commerce, including a duty to insure that the Anchors did not pose a significantly increased risk of injury to Plaintiff and other consumers and to warn consumers of known and knowable risks regarding the Anchors.

85. Arthrex breached those duties and failed to exercise reasonable care in designing, manufacturing, testing, marketing and distributing the Anchors due to the unreasonable and foreseeable risk that the Anchors could break when used and intended by Arthrex. Arthrex also breached its duty to warn by failing to disclose the known or knowable risk of Anchor breakage to Plaintiff and/or his medical providers.

86. Arthrex's negligence caused Plaintiff's injury in an amount to be determined at trial. Further, Arthrex's actions and omissions as identified in this Complaint constitute a flagrant

17

disregard for human life.

## FIFTH CLAIM FOR RELIEF
### BREACH OF IMPLIED WARRANTY
### OF MERCHANTABILITY/FITNESS FOR A PARTICULAR PURPOSE

87. Plaintiff realleges and incorporates by reference the allegations elsewhere in the Complaint as if set forth fully herein.

88. Plaintiff brings this claim on behalf of himself and the Class.

89. Arthrex is the manufacturer, distributor, and/or seller of the Products.

90. Arthrex, as the manufacturer, marketer, distributor, and/or seller of the Anchors, impliedly warranted, among other things, that the Anchors were merchantable, in that: (a) the Products would pass without objection in the trade under the contract description; (b) the Anchors were of fair average quality within the description; (c) the Anchors were fit for the ordinary purposes for which such goods are used; and (d) the Anchors conformed to the promise or affirmations of fact made on the containers or labels if any.

91. Arthrex breached the Anchors' implied warranty because the Anchors could not pass without objection in the trade under the contract description; the Anchors were not of fair or average quality within the description; the Anchors were unfit for their intended and ordinary purpose; and the Anchors did not conform to promises and affirmations of fact on the labeling. The Anchors were not merchantable and defective in that they posed an unreasonable risk of breaking when used as directed and intended by Arthrex and that defect existed when Arthrex delivered the Anchors to Plaintiff and/or his medical providers.

92. Moreover, when Arthrex offered and sold the Products, Arthrex had reason to know that the Anchors would be used for labral repairs; Arthrex expressly stated that the Anchors were indicated for labral repairs; and Arthrex knew that Plaintiff and his medical providers were relying

on Arthrex's skill or judgment to select or furnish suitable goods for labral repairs. Instead of providing goods fit for labral repair, the Anchor posed an unreasonable risk of breakage even when used as intended and directed by Arthrex.

93. Plaintiff and/or his medical providers purchased and used the Anchors in reliance upon Arthrex's skill and judgment and the implied warranties of fitness for labral repair. Plaintiff and his medical providers did not receive the Anchors as impliedly warranted by Arthrex.

94. Arthrex's warranty breaches caused Plaintiff injury in an amount to be determined at trial. Further, Arthrex's actions and omissions as identified in this Complaint constitute a flagrant disregard for human life.

95. Plaintiff was not required to provide Arthrex with notice of its warranty breaches to the extent Arthrex was acting as the manufacturer of the Anchors; based on futility; and/or because Arthrex was on notice of its breaches from other sources, including adverse reports of Anchor breakage prior to Plaintiff's surgery (as alleged above). Moreover, Plaintiff's healthcare providers notified Arthrex of the defect and in response Arthrex withdrew its Arthrex Anchors from the hospital where Plaintiff's surgery was performed and possibly from other hospitals.

96. To the extent Plaintiff did not purchase Anchors directly from Arthrex, privity between Plaintiff and Arthrex is not required because Plaintiff was personally injured by the Anchors. Moreover, Plaintiff was the known end user of the Anchors; the Anchors' implied warranties were intended for Plaintiff's immediate benefit, and Plaintiff was the intended third-party beneficiary of the warranties between Arthrex and Arthrex's direct purchasers.

## JURY DEMAND

97. Plaintiff demands a trial by jury on all issues.

**WHEREFORE**, Plaintiff, on behalf of himself and the proposed Class, prays for judgment as follows:

(a) Declaring this action to be a proper class action and certifying Plaintiff as the representative of the Class under Rule 23;

(b) Awarding actual, compensatory, and punitive damages exceeding $75,000, exclusive of interests and costs;

(c) Awarding Plaintiff the costs and expenses incurred in this action, including reasonable allowance of fees for Plaintiff's attorneys, experts, and reimbursement of Plaintiff's expenses; and

(d) Granting such other and further relief as the Court may deem just and proper.

Dated: August 8, 2023

**SQUITIERI & FEARON, LLP**

By: /s/ *Stephen J. Fearon, Jr.*
Stephen J. Fearon, Jr.
Paul V. Sweeny
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 421-6492
Facsimile: (212) 421-6553
Email: Stephen@sfclasslaw.com
Email: Paul@sfclasslaw.com

**ATTORNEYS FOR PLAINTIFF**