UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
RICHARD STAUBITZ, *on behalf of himself and all others similarly situated*,

Plaintiff,

v.

ARTHREX, INC.,

Defendant.
-----------------------------------------------------------x

**MEMORANDUM AND ORDER**
23-CV-6004 (RPK) (CHK)

RACHEL P. KOVNER, United States District Judge:

Plaintiff Richard Staubitz brings this putative class action in connection with personal injuries allegedly resulting from a medical device manufactured by defendant Arthrex, Inc. He asserts defendant is strictly liable due to a design defect, a manufacturing defect, and its failure to warn, and is also liable because it was negligent and breached implied warranties. Defendant has moved to dismiss plaintiff's claims under Federal Rule of Civil Procedure 12(b)(6). For the reasons explained below, the motion to dismiss is denied.

## BACKGROUND

The following facts are taken from the complaint and are assumed true.

In late 2022, defendant began marketing, distributing, and selling the Knotless 1.8 Fibertak Soft Anchor (the "Anchor"). Compl. ¶¶ 1, 14–15 (Dkt. #1). The Anchor consists of a polyester sheath, an inserter, and a suture, *id.* ¶ 16, and is used for various joint surgeries, "including for labral tear repairs in the shoulder," *id.* ¶ 18.

In April 2023, plaintiff underwent arthroscopic surgery to repair a labral tear in his left shoulder, during which the surgeon used an Anchor to reattach plaintiff's labrum to his shoulder socket. *Id.* ¶¶ 2, 22. Plaintiff experienced lack of mobility and pain after the surgery, and "an X-

Ray and CT scan revealed" in May and June 2023 that those complications "resulted from two metal fragments in [his] shoulder after the Anchor inserters broke." *Id.* ¶¶ 3, 23–24. Plaintiff was advised by his surgeon to undergo a second surgery to remove the fragments, and he did so in July 2023 after receiving a second opinion to the same effect. *Id.* ¶¶ 6, 25–27.

Plaintiff filed this putative class action in August 2023. In the complaint, plaintiff alleges that the Anchor "suffer[s] from a design . . . defect" and presents three "feasible designs" that "could have . . . prevented" the Anchor inserters from breaking. *Id.* ¶¶ 30, 34. Plaintiff also alleges that the Anchor "suffer[s] from a . . . manufacturing defect" resulting from "a mishap in the manufacturing process[,] improper workmanship[,] or because defective materials were used in construction," such as "an unintended deviation from [defendant]'s specified composite of titanium" and other materials. *Id.* ¶¶ 30, 35–37. Plaintiff contends that "a design or manufacturing defect" is evident from the fact that the Anchor did "break when used as directed and intended by" defendant. *Id.* ¶ 38.

According to an FDA database, defendant received approximately 50 reports describing Anchor breaks "substantially similar" to plaintiff's Anchor break between late 2022 and June 2023, at least 28 of which defendant received prior to plaintiff's surgery. *Id.* ¶¶ 42–43. Defendant is also "subject to regulatory oversight and internal quality assurance and prototyping and testing programs that . . . should identify existing and emerging risks." *Id.* ¶ 41. On those bases, plaintiff alleges that defendant actually or constructively knew of "latent risks . . ., including the risk of Anchor breakage," and failed to disclose such risks. *Id.* ¶¶ 5, 30–32, 44.

The complaint asserts five causes of action: strict products liability for design defect, *id.* ¶¶ 58–64, strict products liability for manufacturing defect, *id.* ¶¶ 65–71, strict products liability for

failure to warn, *id.* ¶¶ 72–80, negligence, *id.* ¶¶ 81–86, and breach of implied warranty, *id.* ¶¶ 87–96. Plaintiff seeks damages as well as attorney fees and costs. *Id.* at 20.

Defendant has moved to dismiss plaintiff's complaint under Federal Rule of Civil Procedure 12(b)(6). *See* Mot. to Dismiss (Dkt. #18). Defendant argues that plaintiff's design-defect and failure-to-warn claims are preempted by the Medical Device Amendments ("MDA") to the Federal Food, Drug, and Cosmetic Act ("FDCA"). *See* Mem. in Supp. of Mot. to Dismiss 3–14 (Dkt. #19). Defendant also argues that all of plaintiff's claims are inadequately pleaded. *Id.* at 14–22.

**STANDARD OF REVIEW**

Federal Rule of Civil Procedure 12(b)(6) permits a defendant to move to dismiss a complaint for "failure to state a claim upon which relief can be granted." To avoid dismissal on that basis, a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ibid.* (discussing Fed. R. Civ. P. 8). The facial "plausibility standard is not akin to a 'probability requirement,'" but it requires a plaintiff to allege sufficient facts to allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ibid.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "A well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof [of the facts alleged] is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (quotation marks and citation omitted).At the motion-to-dismiss stage, a court may consider only (i) the complaint itself, (ii) documents either attached to the complaint or incorporated in it by reference, (iii) documents the plaintiff relied on and knew of when bringing suit, and (iv)

matters in the public record that are subject to judicial notice. *See, e.g.*, *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004); *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999). When reviewing the complaint on a motion to dismiss, the court must accept the well-pleaded factual allegations set forth in the complaint as true, *Iqbal*, 556 U.S. at 678, and "draw all reasonable inferences in favor of the plaintiff," *Buon v. Spindler*, 65 F.4th 64, 76 (2d Cir. 2023) (citation omitted). The court is not, however, obligated to adopt "mere conclusory statements" or "threadbare recitals of the elements of a cause of action" that are not "supported by factual allegations." *Iqbal*, 556 U.S. at 678–79.

## DISCUSSION

Defendant's motion to dismiss is denied.

### I. Plaintiff's design-defect claim is not preempted.

Federal law does not preempt plaintiff's design-defect claim.

"In general, three types of preemption exist: (1) express preemption, where Congress has expressly preempted local law; (2) field preemption, where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law; and (3) conflict preemption, where local law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives." *Gazzola v. Hochul*, 88 F.4th 186, 198 (2d Cir. 2023) (quotation marks and citation omitted).

Defendant invokes the third category, arguing that impossibility preemption bars the design-defect claim. *See* Mem. in Supp. of Mot. to Dismiss 5–14. Under that branch of conflict preemption, a state law is preempted when it "'penalizes what federal law requires,' or when state

law claims 'directly conflict' with federal law." *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 725 F.3d 65, 97 (2d Cir. 2013) (quoting *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 873 (2000), and *Am. Tel. & Tel. Co. v. Cent. Office Tel., Inc.*, 524 U.S. 214, 227 (1998)). Federal law preempts state law even if it consists of "[f]ederal regulations" instead of "federal statutes." *SPGGC, LLC v. Blumenthal*, 505 F.3d 183, 188 (2d Cir. 2007) (quoting *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 153 (1982)). Defendant submits that the MDA requires the Anchors to be manufactured in their current form, or at least without the design changes that plaintiff asserts are required by state common law.

Addressing this argument requires starting with the structure of the MDA. By default, the statute requires many new medical devices to undergo a "rigorous" Food and Drug Administration ("FDA") approval process before they may be marketed to the public. *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 317 (2008). The FDA will not grant premarket approval unless the agency has "'reasonable assurance' that the device is both safe and effective." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 477 (1996) (quoting 21 U.S.C. § 360e(d)(2)). "Once a device has received premarket approval, the MDA forbids the manufacturer to make, without FDA permission, changes in design specifications, manufacturing processes, labeling, or any other attribute, that would affect safety or effectiveness." *Riegel*, 552 U.S. at 319 (citing 21 U.S.C. § 360e(d)(6)(A)(i)).

Crucially, though, the MDA also provides avenues for devices to enter the market without premarket approval or a comparable safety review. "Devices sold before the MDA's effective date may remain on the market," for example, without going through the premarket approval process, unless the FDA requires otherwise by regulation. *Riegel*, 552 U.S. at 317 (citing 21 U.S.C. §§ 360c(f)(1), 360e(b)(1)). In addition, some new devices can be sold without premarket approval through what is called a "premarket notification" or Section 510(k) notification. *See* 21 U.S.C.

§ 360(k). To enter the market through this route, the FDA must determine that the device is "substantially equivalent" to an existing device that may be legally marketed. *Lohr*, 518 U.S. at 478 (citing 21 U.S.C. § 360e(b)(1)(B)). This process is designed to ensure that older devices exempt from the premarket approval process cannot "monopoliz[e] the market while new devices clear" that "hurdle." *Lohr*, 518 U.S. at 478; *see id.* at 494 ("Congress intended merely to give manufacturers the freedom to compete, to a limited degree, with and on the same terms as manufacturers of medical devices that existed prior to 1976."). Because clearance under Section 510(k) rests on a determination that the device is similar to an existing one—not a determination that the device is safe—the FDA expressly provides by regulation that such a notification "does not in any way denote official approval of the device." 21 C.F.R. § 807.97. After a device has been cleared for sale through the Section 510(k) process, the manufacturer must again obtain FDA approval before making "significant changes" to the device. *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 119 (2d Cir. 2006) (citing 21 C.F.R. § 807.81(a)(3)), *aff'd*, 552 U.S. 312 (2008). Defendant's Anchors entered the market based on this substantial equivalence process, which historically has been the "means by which most new medical devices . . . were approved for the market." *Lohr*, 518 U.S. at 479; *see Riegel*, 552 U.S. at 318 ("In 2005, for example, the FDA authorized the marketing of 3,148 devices under § 510(k) and granted premarket approval to just 32 devices."); *see also Kaiser v. Johnson & Johnson*, 947 F.3d 996, 1004 (7th Cir. 2020).

The Supreme Court has decided a pair of cases addressing preemption of state requirements for medical devices that shed substantial light—through their reasoning—on plaintiff's claims here. Both decisions interpret the MDA's express preemption clause, which applies to any state-law "requirement—(1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and (2) which relates to the safety or effectiveness of the device or to

any other matter included in a requirement applicable to the device under this chapter." 21 U.S.C. § 360k(a). In *Riegel v. Medtronic*, the Supreme Court held that when a medical device has entered the market through the MDA's premarket approval process—in other words, based on a determination regarding its safety—this express preemption clause preempts any additional or different state requirements with respect to the device's safety or effectiveness. *Riegel*, 552 U.S. at 322–23.

In contrast, in *Medtronic v. Lohr*, the Court held that this express preemption clause does *not* preempt state-law tort claims against medical devices that entered the market based on a substantial equivalence determination, because the MDA does not impose any "requirements" with respect to such devices. *Lohr*, 518 U.S. at 493–94. The Court began from a presumption against preemption in the context of state exercises of "historic police powers" over "matters of health and safety." *Id.* at 485 (citation omitted). Determining whether that presumption was overridden required an examination of what the Court referred to as "the purpose of Congress"—"the ultimate touchstone in every pre-emption case." *Ibid.* (brackets, quotation marks, and citation omitted). That inquiry, in turn, required looking "primarily" to "the language of the pre-emption statute and the 'statutory framework' surrounding it," but also to "the 'structure and purpose of the statute as a whole.'" *Id.* at 485–86 (citations omitted).

Conducting that inquiry, the Court determined that Section 510(k) clearance of a medical device did not trigger the MDA's express preemption clause because it did not impose any federal "require[ment]," but instead gave an "exemption" from the manufacturer's federal obligation to seek premarket approval. *Lohr*, 518 U.S. at 493–94; *see Riegel*, 552 U.S. at 322. The Court relied on the fact that "the 510(k) process is focused on *equivalence*, not safety"—allowing certain devices to escape the premarket approval process so that equivalent devices who benefited from

the statute's grandfather clause did not enjoy monopoly power. *Lohr*, 518 U.S. at 493. Examining structure and history, the Court found "no suggestion" that this pro-competitive exemption from federal safety review was meant to exempt manufacturers from the forms of state liability that existed when the MDA was enacted—"includ[ing] the possibility that the manufacturer of the device would have to defend itself against state-law claims of negligent design." *Id.* at 494. Since the FDA's Section 510(k) clearance "simply allowed the pacemaker, as a device substantially equivalent to one that existed before 1976, to be marketed" without premarket approval, it "did not 'require'" the defendant's Section 510(k)-cleared pacemaker "to take any particular form for any particular reason." *Id.* at 493–94. The Court therefore determined there was no federal "requirement" triggering the MDA's preemption clause.

While *Lohr* involved express preemption, it renders defendant's implied-preemption theory untenable. Conflict preemption depends on the existence of a federal requirement. *See, e.g.*, *In re MTBE Prod. Liab. Litig.*, 725 F.3d 65, 97 (2d Cir. 2013) (describing conflict preemption as a "demanding defense" that applies when "state law penalizes what federal law requires" or when state-law requirements "directly conflict" with federal-law requirements (citations omitted)); *PLIVA Inc. v. Mensing*, 564 U.S. 604 (2011) ("[S]tate and federal law conflict where it is 'impossible for a private party to comply with both state and federal requirements.'" (citation omitted)); *see* Mem. in Supp of Mot. to Dismiss 5–6 (citing *Mensing* formulation). And *Lohr* determined that the Section 510(k) clearance process does not impose federal "requirements" at all. 518 U.S. at 493. Defendant offers no persuasive reason why Section 510(k) clearance would impose "requirements" for purposes of implied preemption, even though it does not for purposes of express preemption.

The reasoning the Supreme Court employed in *Lohr* undercuts any such theory. *Lohr*'s understanding of the express preemption clause turned on considerations that also apply to an implied preemption analysis: "th[e] background behind the 'substantial equivalence' exemption, the fact that '[t]he purpose of Congress is the ultimate touchstone in every pre-emption case, and the presumption against pre-emption." *Id.* at 494 (citation omitted). Indeed, as noted above, the Court suggested in *Lohr* that the "statutory scheme" was not "intended to do anything other than maintain the status quo" with respect to state-law liability for devices cleared under Section 510(k). *Ibid.* Defendant's approach would be inconsistent with the Court's understanding of the MDA's structure, because it would sweep away exactly the state-common-law duties that the Court indicated the MDA was structured to preserve.[*]

Compounding the reasoning in *Lohr*, the existence of the MDA's express preemption clause itself undermines defendant's arguments. An express preemption clause "supports a reasonable inference" "that Congress did not intend to pre-empt other matters." *Freightliner Corp. v. Myrick*, 514 U.S. 280, 288 (1995). Contrary indicators can override that inference, so an express preemption clause "does not . . . entirely foreclose[] any possibility of implied pre-emption." *Ibid.* But Congress's decision to include an express preemption clause that does not preempt state tort

[*] In its reply, defendant also attempts to avoid *Lohr*'s reasoning by suggesting that the Section 510(k) clearance process has changed since that decision. Reply in Supp. of Mot. to Dismiss 5–7 (Dkt. #22). But defendant fails to cite a single statutory or regulatory provision that mandates the submission of information regarding safety, or FDA consideration of safety, during the Section 510(k) process. *See* 21 U.S.C. § 360c(i)(1)(A) (specifying that "substantial equivalence" requires a device to have "the same intended use as [a] predicate device" and *either* have "the same technological characteristics as the predicate device," *or* have "different technological characteristics" and be "as safe and effective as" the predicate device); *id.* § 360c(i)(3)(A) ("[T]he person required to file a premarket notification . . . shall provide an adequate summary of any information respecting safety and effectiveness *or* state that such information will be made available upon request by any person." (emphasis added)); 21 C.F.R. § 807.81(a) (listing various circumstances under which Section 510(k) clearance is required, including when a currently authorized device "is about to be significantly changed or modified in design, components, method of manufacture, or intended use," and specifying that one factor that may be relevant to whether a change is significant is whether it might "significantly affect the safety or effectiveness of the device").

claims against Section 510(k)-cleared devices makes it somewhat implausible that Congress designed the statute to impliedly preempt those same claims.

Defendant's conflict preemption argument relies on *Mensing*. There, the Supreme Court held that the FDCA and its accompanying regulations preempted state-law failure-to-warn claims regarding generic drugs because "it was impossible for the [drug manufacturers] to comply with both their state-law duty to change the label and their federal-law duty to keep the label the same." *Mensing*, 564 U.S. at 618. Defendant argues that this case resembles *Mensing* "in all the ways that matter," Mem. in Supp. of Mot. to Dismiss 9, but it is mistaken. The regulatory regime at issue in *Mensing* is meaningfully different from the Section 510(k) clearance framework, and "different federal statutes and regulations may . . . lead to different pre-emption results." *Mensing*, 564 U.S. at 626. Specifically, the regulatory regime at issue in *Mensing* subjects drug makers to the type of safety-based restrictions that the Court found absent in *Lohr*. A new drug may be brought to market only if its manufacturer "prove[s] that it is safe and effective and that the proposed label is accurate and adequate." *Id.* at 612. A generic-drug manufacturer, however, can gain FDA approval "without duplicating the clinical trials already performed on the equivalent brand-name drug" "simply by showing equivalence to a reference listed [brand-name] drug that has already been approved by the FDA," and using a label that "is the same as the labeling approved for the [brand-name] drug." *Id.* at 612–13. The generic-drug manufacturers "have an ongoing federal duty of 'sameness'" that is dependent upon the safety determination made about the brand-name drug. *Id.* at 613. *Mensing* thus found conflict preemption based on the type of federal safety rule that *Lohr* emphasized does not exist for Section 510(k)-cleared devices that instead receive an "exemption" from federal safety review. *Lohr*, 518 U.S. at 494. Accordingly, that decision does not establish that the disanalogous Section 510(k) clearance process establishes federal-law

"requirements" for purposes of conflict preemption. Because *Lohr* and its reasoning indicate that the Section 510(k) process does not do so, defendant's conflict preemption claim fails.

The handful of courts to consider similar claims appear to have reach the same conclusion. *See Kaiser*, 947 F.3d at 1008–10; *Hudspeth v. Ethicon, Inc.*, No. 20-CV-529 (BJC) (JBT), 2022 WL 22867872, at *2 (M.D. Fla. Dec. 22, 2022); *Aquino v. C.R. Bard, Inc.*, 413 F. Supp. 3d 770, 783–84 (N.D. Ill. 2019); *In re Bard IVC Filters Prods. Liab. Litig.*, No. 15-MDL-2641 (DGC) (PHX), 2017 WL 5625547, at *13–14 (D. Ariz. Nov. 22, 2017); *Mullins v. Ethicon, Inc.*, 147 F. Supp. 3d 478, 481–85 (S.D. W. Va. 2015).

## II. Plaintiff's failure-to-warn claim is not preempted.

Defendant fails to establish that plaintiff's strict products-liability claim for failure to warn is a preempted fraud-on-the-FDA claim under *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001). *See* Mem. in Supp. of Mot. to Dismiss 12–14. The Section 510(k) process requires applicants to submit "[p]roposed labels, labeling, and advertisements sufficient to describe the device, its intended use, and the directions for its use." 21 C.F.R. § 807.87(e). "The FDA is empowered to" "detect[], deter[], and punish[] false statements made during this . . . process[]." *Buckman*, 531 U.S. at 349 (citing 21 U.S.C. § 372). Those provisions conflict preempt state-law claims for which "proof of fraud against the FDA is *alone sufficient* to impose liability." *Desiano v. Warner-Lambert & Co.*, 467 F.3d 85, 95 (2d Cir. 2006), *aff'd sub nom.*, *Warner-Lambert Co., LLC v. Kent*, 552 U.S. 440 (2008). But federal law does not conflict preempt state-law claims "premised on traditional duties between a product manufacturer and . . . consumers," rather than a "duty between a manufacturer and a federal agency," even if "there is also evidence of fraud in FDA disclosures." *Id.* at 94–95.

Plaintiff's failure-to-warn claim is not the "unusual and narrow" claim preempted under *Buckman*. *Id.* at 95. Instead, the complaint alleges that defendant "failed to warn or disclose to Plaintiff or his medical providers the Anchor breakage risk despite a duty to do so." Compl. ¶ 76. Plaintiff supports the failure-to-warn claim with factual allegations suggesting that defendant received at least 28 reports of Anchor breakage prior to plaintiff's surgery but failed to warn plaintiff of that risk. *See id.* ¶¶ 4–5, 42–43. Those reports occurred after defendant had introduced the Anchor into the market, *see ibid.*, and therefore any consequent obligation to warn does not, and indeed cannot, depend on the Section 510(k) process. To be sure, the complaint also alleges that defendant must have known of the Anchor's breakage risk due to "regulatory oversight" and defendant's "quality assurance measures[] and audit procedures." *Id.* ¶¶ 41, 77. But because the gravamen of plaintiff's claim is that defendant failed to warn doctors and consumers of a risk that it learned about after introducing the Anchor to market, plaintiff's claim is not a fraud-on-the-FDA claim preempted under *Buckman*.

## III. Plaintiff has adequately pleaded claims for strict products liability, negligence, and breach of the implied warranty of merchantability.

While plaintiff consents to dismissal of his claim for breach of implied warranty of fitness for a particular purpose, Mem. in Opp'n to Mot. to Dismiss 23 n.15 (Dkt. #21), the motion to dismiss is denied as to plaintiff's remaining claims: strict products liability, negligence, and breach of implied warranty of merchantability.

### A. Defendant's motion is denied as it pertains to plaintiff's design-defect claim.

Plaintiff adequately pleads a strict products-liability claim for design defect.

Under New York law, a plaintiff seeking to impose strict liability for a design defect must show that: (1) the product as designed posed "a substantial likelihood of harm," (2) "it was feasible to design the product in a safer manner," and (3) "the defective design was a substantial factor in

causing the plaintiff's injury." *Darrow v. Hetronic Deutschland GMBH*, 121 N.Y.S.3d 173, 177 (App. Div. 2020) (brackets and citations omitted); *see Goldin v. Smith & Nephew, Inc.*, No. 12-CV-9217 (JPO), 2013 WL 1759575, at *4 (S.D.N.Y. Apr. 24, 2013).

Plaintiff adequately pleads these elements. Plaintiff plausibly alleges that the product as designed posed a substantial likelihood of harm, and that the defective design was a substantial factor in causing his injury, by allegations that the breakage in his own case was part of a pattern involving numerous similar incidents. Specifically, plaintiff alleges that his surgeon used defendant's Anchors "as intended and directed by" defendant, but that two Anchors broke inside his shoulder, injuring him. *See* Compl. ¶¶ 2–3, 22, 33, 38. Plaintiff alleges many other instances of similar breakage, asserting that defendant "received an unusual number of adverse reports of Anchor breakage"—about 50—between "late 2022" and June 2023. *Id.* ¶ 42. In contrast, defendant "received one adverse report" during that period concerning the anchor used in plaintiff's revision surgery. *Ibid.* With respect to the element pertaining to feasible alternative designs, plaintiff pleads that certain feasible alternative designs would alleviate the Anchor's breakage risk, including a design that uses "more durable materials" or that "distribute[s] impact forces evenly." *Id.* ¶ 34. Taken together, these allegations are sufficient to withstand a motion to dismiss. *See, e.g.*, *Reynolds-Sitzer v. EISAI, Inc.*, 586 F. Supp. 3d 123, 130 (N.D.N.Y. 2022) (denying motion to dismiss a design defect claim and finding it sufficient that "[p]laintiffs allege[d] that [defendant's drug], designed as a serotonin receptor agonist for weight loss, posed a substantial likelihood of harm, and that the safer alternative was a drug that did not affect the serotonin pathway"); *Cowan v. Costco Wholesale Corp.*, No. 15-CV-5552 (PKC), 2017 WL 59080, at *2–3 (E.D.N.Y. Jan. 5, 2017); *Sullivan v. Aventis, Inc.*, No. 14-CV-2939 (NSR), 2015 WL 4879112, at *7 (S.D.N.Y. Aug. 13, 2015).

In arguing to the contrary, defendant invokes cases dismissing complaints with substantially less detailed pleadings. *See, e.g.*, *Trisvan v. Heyman*, 305 F. Supp. 3d 381, 404 (E.D.N.Y. 2018) (dismissing design defect claim regarding a drug due to complaint's conclusory pleading that drug "would cause more harm than good to consumers"); *Surdo v. Stamina Prods., Inc.*, No. 15-CV-2532 (JG), 2015 WL 5918318, at *4 (E.D.N.Y. Oct. 9, 2015) (dismissing design defect claim where plaintiff did "not allege how the product is defectively designed, and ma[de] only conclusory allegations that [the product] was 'inherently dangerous' and 'defective,' that its parts were 'hazardous, unsuitable,' and that it was 'defectively designed'").

Defendant is mistaken in arguing that allegations regarding similar incidents cannot support an inference of substantial risk of harm without allegations about the total number of surgeries in which the screw was used. *See* Mem. in Supp. of Mot. to Dismiss 16. The sheer volume of breakage reports alleged during less than a year raises a plausible inference of substantial risk of harm. *See Anderson v. Hedstrom Corp.*, 76 F. Supp. 2d 422, 456 (S.D.N.Y. 1999) ("[U]nder the law of New York . . . . this question [of reasonable safety] is one for the jury, and involves an extensive multi-factor balancing test."). Plaintiff's allegation that defendant received only one report of breakage for a different model during that period amplifies that common-sense conclusion.

Defendant errs in arguing that plaintiff's design-defect claim is fatally undermined by plaintiff's failure-to-warn claim, alleging that if defendant had provided adequate warnings, plaintiff's "medical providers would not have purchased or used the Anchors . . . or would have prevented . . . the anchor breakage." Compl. ¶ 79. To the extent that this paragraph is read as an allegation that the Anchors could have been safely used with adequate warnings, plaintiff is permitted to plead that claim in the alternative. *See* Fed. R. Civ. P. 8(d)(2)–(3) ("A party may set

out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. . . . A party may state as many separate claims . . . as it has, regardless of consistency."); *see also, e.g.*, *Narvaez v. Wadsworth*, 98 N.Y.S.3d 501 (Tbl.), at *7 (Sup. Ct. 2018), *aff'd*, 84 N.Y.S.3d 479 (App. Div. 2018) ("Plaintiff has adequately alleged the existence of a design defect in the helmet, independent of his claim that the helmet was defective because of its lack of warnings.").

Defendant's motion to dismiss is therefore denied as it pertains to the design-defect claim.

**B. Defendant's motion is denied as it pertains to plaintiff's manufacturing-defect claim.**

Plaintiff adequately pleads a strict products-liability claim for manufacturing defect.

Under New York law, a manufacturing defect exists "when a mistake in manufacturing renders a product that is ordinarily safe dangerous so that it causes harm." *McCarthy v. Olin Corp.*, 119 F.3d 148, 154 (2d Cir. 1997) (citing *Victorson v. Bock Laundry Mach. Co.*, 37 N.Y.2d 395 (1975)). To establish a manufacturing defect, "the plaintiff must show that a specific product unit was defective as a result of 'some mishap in the manufacturing process itself, improper workmanship, or because defective materials were used in construction,' and that the defect was the cause of plaintiff's injury." *Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 85 (S.D.N.Y. 2001) (quoting *Caprara v. Chrysler Corp.*, 52 N.Y.2d 114, 129 (1981)). "A manufacturing defect can be demonstrated either through evidence identifying a specific flaw, or through reliance on circumstantial evidence." *Z.C. v. Wal-Mart Stores, Inc.*, 574 F. App'x 52, 54 (2d Cir. 2014) (citing *Speller v. Sears, Roebuck & Co.*, 100 N.Y.2d 38, 42 (2003)). "[I]n the absence of evidence identifying a specific flaw, a plaintiff must prove that the product did not perform as intended and exclude all other causes for the product's failure that are not attributable to defendants." *Riegel*, 451 F.3d at 125 (quoting *Speller*, 100 N.Y.2d at 41).

The complaint's factual allegations satisfy the requirements for a manufacturing defect claim. Plaintiff alleges facts suggesting that the Anchors used in his surgery were defective given that they broke and harmed plaintiff despite being "used as intended and directed by" defendant. *See* Compl. ¶¶ 2–3, 6, 22–27, 35–38. The complaint alleges various ways in which the Anchors "deviate[d] in quality and other performance standards from other identical Anchors" such as "an unintended deviation from Arthrex's specified composite of titanium, PEEK (polyetheretherketone), poly (L-Lactide) or poly (L-Lactide-co-D, L-Lactide)." *Id.* ¶ 37. Plaintiff further pleads that defendant later "requested that the hospital where Plaintiff had his surgery and its medical providers stop using the Anchors and return all Anchors to Arthrex for further investigation." *Id.* ¶ 29. Taken together, it is reasonable to infer from these allegations that the specific Anchors used in plaintiff's surgery, as opposed to "other identical Anchors," plausibly suffered from a manufacturing defect. *See, e.g.*, *Sokolovic v. CVS Health*, No. 17-CV-6609 (RPK), 2023 WL 2742148, at *13 (E.D.N.Y. Mar. 31, 2023); *Williamson v. Stryker Corp.*, No. 12-CV-7083 (CM), 2013 WL 3833081, at *6 (S.D.N.Y. July 23, 2013) ("It is sufficient at this stage that Plaintiffs have alleged that the two knee devices broke, and that nothing [the surgeon] did caused the break.").

Defendant is therefore mistaken in relying on cases dismissing claims that fail to plead a distinction between the allegedly defective product and other products of the same design. *See* *Reed v. Pfizer, Inc.*, 839 F. Supp. 2d 571, 577 (E.D.N.Y. 2012) (dismissing claim where plaintiff did "not plead[] facts indicating how or why the [product] ingested by [plaintiff] differed from its design"); *Krulewich v. Covidien, LP*, 498 F. Supp. 3d 566, 574 (S.D.N.Y. 2020) (dismissing claim where complaint merely alleged that the product "deviated from manufacturing standards when it came off the production line").

Defendant also argues that its alleged recall of the Anchors from the hospital where plaintiff had his surgery does not suggest a manufacturing defect because plaintiff did not plead that those Anchors were part of the same product lot as the allegedly defective ones. *See* Reply in Supp. of Mot. to Dismiss 8 (Dkt. #22). But it is at least reasonable to infer that Arthrex recalled Anchors in the same product lot as the one used in plaintiff's surgery when it asked the hospital performing the surgery to "stop using the Anchors and return all Anchors to Arthrex." Compl. ¶ 29.

Defendant's motion to dismiss is denied as it pertains to the manufacturing-defect claim.

**C. Defendant's motion is denied as it pertains to plaintiff's failure-to-warn claim.**

Plaintiff adequately pleads that defendant is strictly liable for his injuries based on a failure-to-warn theory. Under New York law, "[a] manufacturer has a duty to warn against latent dangers resulting from foreseeable uses of its product of which it knew or should have known." *Kosmynka v. Polaris Indus., Inc.*, 462 F.3d 74, 81 (2d Cir. 2006) (quoting *Liriano v. Hobart Corp.*, 92 N.Y.2d 232, 237 (1998)). "There are several ways that a plaintiff can demonstrate that a manufacturer knew or should have known that its product could cause a specific injury." *De La Cruz v. Ecolab Inc.*, No. 18-CV-6983 (GHW), 2020 WL 247885, at *4 (S.D.N.Y. Jan. 16, 2020). For example, to "show that [a manufacturer] either knew or should have known about a risk of chemical burns," a plaintiff could identify "a relevant medical study or presentation that was known to the manufacturer," "filed cases or public news reports regarding similar incidents," or "[t]he results of the manufacturer's product testing." *Ibid.*

The complaint plausibly alleges that defendant knew or should have known its Anchors could break when used in a foreseeable manner through its allegations about dozens of breakage reports to the FDA and to defendant prior to plaintiff's surgery. *See* Compl. ¶¶ 4–5, 42–44; *see*

*also, e.g.*, *Bee v. Novartis Pharms. Corp.*, 18 F. Supp. 3d 268, 288 (E.D.N.Y. 2014) (denying summary judgment on failure-to-warn claim where plaintiffs noted a medical study and "multiple cases of [plaintiff's medical condition] allegedly reported during . . . clinical trials" which connected that condition to a material in defendant's drugs); *Golod v. La Roche*, 964 F. Supp. 841, 856 (S.D.N.Y. 1997) (denying the same where adverse reaction reports to the FDA "indicate[d] that . . . [certain] ocular symptoms have occurred in patients using [defendant's drug] and related compounds," raising "a question of fact" as to defendant's awareness and consequent "duty to warn of such effects").

Defendant also advances the same argument it raises in response to the design-defect claim: the complaint is deficient despite alleging other reports of Anchor breakage because the complaint does not allege how often the Anchor was used, and so what its overall rate of failure was. Mem. in Supp. of Mot. to Dismiss 19–20. That argument fails for the same reasons discussed at page 14, *supra*. Drawing all reasonable inferences in plaintiff's favor, plaintiff's allegations of dozens of similar failures in a short period of time support an inference that breakage was a latent danger as to which defendant had a duty to warn. *See Sokolovic*, 2023 WL 2742148, at *14–15.

Defendant's motion to dismiss is therefore denied as it pertains to the failure-to-warn claim.

**D. Defendant's motion is denied as it pertains to plaintiff's negligence claim.**

Because defendant's motion to dismiss is denied as to all three of plaintiff's strict liability claims, it is also denied as to plaintiff's negligence claim. *Miccio v. Conagra Foods, Inc.*, 224 F. Supp. 3d 200, 208 (W.D.N.Y. 2016) ("Under New York law, the elements of negligence claims based on design defect, manufacturing defect, and failure to warn theories are the same as those under strict liability."); *see Candelaria v. Conopco, Inc.*, No. 21-CV-6760 (FB) (TAM), 2023 WL 2266047, at *2 (E.D.N.Y. Feb. 28, 2023) (collecting cases).

**E. Defendant's motion is denied as it pertains to plaintiff's implied-warranty-of-merchantability claim.**

Defendant's arguments for dismissal of plaintiff's claim for breach of implied warranty of merchantability are unpersuasive.

A breach of the implied warranty of merchantability occurs when a product sold is not "fit for the ordinary purposes for which such goods are used." N.Y. U.C.C. § 2-314(2)(c); *see Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 254–59 (1995). "To state a claim for breach of the implied warranty of merchantability, a plaintiff must show, as she would for strict products-liability or negligence claims, that: (1) the product was defectively designed or manufactured; (2) the defect existed when the manufacturer delivered it to the purchaser or user; and (3) the defect was the proximate cause of the injury." *Reynolds-Sitzer v. EISAI, Inc.*, 586 F. Supp. 3d 123, 133 (N.D.N.Y. 2022) (citation omitted).

Defendant's arguments for dismissal of plaintiff's implied warranty of merchantability claim lack merit. First, defendant claims plaintiff's implied warranty claim fails for the same reasons as his products-liability claims. Mem. in Supp. of Mot. to Dismiss 20–21. That argument fails because, as explained above, defendant's products-liability claims are adequately pleaded. *See* pages 12–18, *supra*.

Second, defendant argues that New York law requires plaintiff to adequately plead reliance on defendant's "skill and judgment" to state an implied-warranty claim. Mem. in Supp. of Mot. to Dismiss 21. But the sole case on which defendant relies, *Bichler v. Willing*, 397 N.Y.S.2d 57, 59 (App. Div. 1977), did not establish a general reliance requirement in order to state a claim for breach of the implied warranty of merchantability. *Bichler* is one of a number of cases "that have dismissed warranty claims" in which there was no "evidence that the product was adulterated, misbranded, or otherwise defective." *Fagan v. AmerisourceBergen Corp.*, 356 F. Supp. 2d 198,

216 (E.D.N.Y. 2004). New York courts do not apply such a requirement generally. *See Denny*, 87 N.Y.2d at 254–59 (distinguishing breach of implied warranty from strict products liability only on differing conceptions of "defectiveness").

Third, defendant argues that the Court can consider the contents of the Anchor's directions for use as integral to plaintiff's complaint and that those directions incorporate by reference a page on defendant's website that conspicuously disclaims the implied warranty of merchantability. *See* Mem. in Supp. of Mot. to Dismiss 21–22; Reply in Supp. of Mot. to Dismiss 9–10. Assuming *arguendo* that consideration of both the directions for use and the webpage is proper, defendant has not established at this stage that its disclaimer, which was inconspicuously incorporated by reference in the directions for use, satisfies New York's requirements for disclaiming the implied warranty of merchantability.

"Section 2-316 sets forth the standard for the exclusion of implied warranties under the New York U.C.C. To exclude an implied warranty of merchantability, a contract's disclaimer 'must mention merchantability and in case of a writing must be conspicuous.'" *NY Drilling, Inc. v. TJM, Inc.*, 573 F. Supp. 3d 854, 858 (E.D.N.Y. 2021) (quoting N.Y. U.C.C. § 2-316(2)). Conspicuousness is a question of law "for the court." *Ibid.* (quoting N.Y. U.C.C. § 1-201(10)). A writing is conspicuous when it is "so written, displayed, or presented that a reasonable person against which it is to operate ought to have noticed it." *Ibid.*

Regardless of whether the disclaimer on defendant's webpage is conspicuous, being "in bold and all-caps," Mem. in Supp. of Mot. to Dismiss 21–22, the issue here is whether the document integral to plaintiff's complaint, the directions for use, conspicuously disclaims the implied warranty of merchantability. In the directions for use, the webpage and its disclaimers are "referred to by words in only ordinary type." *Providence & Worcester R. Co. v. Sargent &*

*Greenleaf, Inc.*, 802 F. Supp. 680, 688 (D.R.I. 1992). The directions for use also omit any reference to "merchantability," *see* N.Y. U.C.C. § 2-316(2), and they reference the relevant webpage only at the end of the ten-page document after a page-and-a-half of contact information and a list of trademarks, *see NY Drilling*, 573 F. Supp. 3d at 859 (noting that a provision being "grouped with text that is clearly *not* part of the contracts" cuts against a finding of conspicuousness). Simply put, the critical provision in the directions for use on which defendant's argument relies is not "so written . . . that a reasonable person against which it is to operate ought to have noticed it." N.Y. U.C.C. § 1-201(10).

Defendant's reliance on *NY Drilling* is misplaced. *See* Reply in Supp. of Mot. to Dismiss 10. The all-caps disclaimer which *NY Drilling* found conspicuous was placed directly below the signature block in a contract, and the court emphasized that that provision, by being on the same page as the signature block, was more prominent than provisions in other cases where the disclaimer was placed on the back of the contract. *See NY Drilling*, 573 F. Supp. 3d at 859–60. Nor do those back-of-the-contract cases support defendant's argument, which relies on the proposition that the disclaimer is valid despite being placed in a separate document that is incorporated only by inconspicuous text. *See Nat'l Mulch & Seed, Inc. v. Rexius Forest By-Products Inc.*, 62 U.C.C. Rep. Serv. 2d 371 (S.D. Ohio 2007) (emphasizing that warranty limitations on "the reverse side" of the contract were referenced in capital letters and partially bolded text "beneath the signature line").

And defendant is similarly mistaken to rely on *Materials Handling Enterps., Inc. v. Atlantis Techs., LLC*, 563 F. Supp. 3d 387, 392–93 (W.D. Pa. 2021). While the court there did find a disclaimer conspicuous despite being incorporated by reference with plain text, *see ibid.*, other courts disagree, *see, e.g.*, *Nomo Agroindustrial Sa De CV v. Enza Zaden N. Am., Inc.*, 492 F. Supp.

2d 1175, 1180 (D. Ariz. 2007) (finding fine print "on the front of [an] invoice" referencing "disclaimers on the back of the invoice . . . . not adequate as a reasonable person would not be on notice of the disclaimers at issue"); *Providence & Worcester R. Co.*, 802 F. Supp. at 688. And those courts that find incorporated-by-reference disclaimers valid often require that the text referencing the disclaimer itself be conspicuous in some way, unlike the relevant text in the directions for use here. *See, e.g.*, *Nw. Frozen, LLC v. Victory Packaging, L.P.*, No. 22-CV-1478 (MHC), 2023 WL 2731719, at *7 (N.D. Ga. Feb. 6, 2023) (finding implied warranty of fitness for a particular purpose waived where "the incorporating reference to the General Terms is printed in red, italicized, bolded type directly adjacent to the signature line" and was therefore, itself, "undoubtedly conspicuous").

Defendant's motion to dismiss is therefore denied as it pertains to the implied-warranty-of-merchantability claim.

**CONCLUSION**

For the reasons explained above, defendant's motion to dismiss is denied with the exception that plaintiff's claim for breach of the implied warranty of fitness for a particular purpose is dismissed without prejudice.

SO ORDERED.

Dated: November 13, 2026
Brooklyn, New York

*/s/ Rachel Kovner*
RACHEL P. KOVNER
United States District Judge